IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NILES DODD, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SEPTA, ET AL., | : | |
| Defendants | : | NO. 06-4213 |

<u>MEMORANDUM AND ORDER</u>

PRATTER, J.                                                          JULY 23, 2008

Former SEPTA police officer Niles Dodd has sued his former employer, Southeastern

Pennsylvania Transportation Authority ("SEPTA"), and his former supervisors, David Scott,

Richard Evans and Van Dyke Rowell, (collectively, "Defendants") pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Pennsylvania Human

Relations Act ("PHRA"), 43 Pa. C.S.A. § 955, and 42 U.S.C. § 1983, claiming that they

discriminated against him on the basis of gender and religion, and retaliated against him for

exercising his First Amendment rights.

The Defendants move for summary judgment on all of Officer Dodd's remaining claims.

Officer Dodd opposes the motion.  For the reasons discussed below, the Court will grant

summary judgment in favor of the Defendants with respect to Officer Dodd's First Amendment

claim, but will deny summary judgment with respect Officer Dodd's Title VII and PHRA

religious discrimination claims.

**PROCEDURAL HISTORY**

The Amended Complaint advances claims against SEPTA for religious and gender

discrimination under Title VII and the PHRA (Counts I and III), and retaliation under Title VII

and the PHRA (Counts II and IV), as well as a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983 against all Defendants (Count V).  By Memorandum and Order of June 26, 2007, the Court granted the Defendants' partial Motion to Dismiss and dismissed Officer Dodd's Title VII and PHRA discrimination claims (Counts I and III) to the extent those claims were based on gender.

**FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise noted.

Niles Dodd was a police officer in the SEPTA Police Department from 1999 until termination of his employment on January 10, 2006.  (Def. Mot. Ex. 2, Dodd Dep. 6.)  At all pertinent times, Richard Evans was the Chief of the SEPTA Police Department, David Scott was the Deputy Chief, and Van Dyke Rowell was a captain and Officer Dodd's immediate supervisor. (Id. at 27.)

The date at which point Officer Dodd became a Rastafarian is disputed.  Officer Dodd contends that he became a Rastafarian in 2002 or 2003.  (Id. at 86.)  The Defendants contend that during a meeting with Captain Rowell on December 15, 2004, Officer Dodd stated that he was "considering becoming Rastafarian or Buddhist," (Def. Ex. 10, 12/15/04 Memo), but this contention is disputed.  (Def. Ex. 13, Davis Dep. 27-28, 31).  It is undisputed, however, that Officer Dodd's Rastafarian religious beliefs prohibited him from cutting his hair.  (Def. Statement of Facts ¶ 12; Dodd Dep. 192.)

Beginning in 2003, various officers within the SEPTA Police Department informally rebuked Officer Dodd because of his dreadlock hairstyle.  (Dodd Dep. 26-30; Def. Ex. 8, 12/2/04 Memo.)  Eventually, in February and December 2005, Captain Rowell formally disciplined

2

Officer Dodd for failing to comply with the SEPTA Police Department grooming code, as
articulated in Procedural Directives 10 (effective March 21, 2004) and 11 (effective March 20,
2005), which prohibit officers' hair from "extend[ing] below the uniform cap."[1]  (See Def. Mot.
Ex. 21, 2/9/08 Memo; Def. Mot. Ex. 36, 12/29/05 Memo.)  In addition to, and partly because of,
the ongoing friction concerning his hair, Officer Dodd wrote and distributed two memoranda,
dated December 2, 2004 and January 21, 2005, entitled "Issues of Concern" and "This
Department Needs an Enema," respectively, criticizing the SEPTA Police Department.  (Def.
Mot. Exs. 8 and 15; see also Dodd Dep. 23-24, 29, 37-40, 44, 116.)

Following the distribution of Officer Dodd's memoranda, on January 24, 2005, Chief
Evans ordered Officer Dodd to attend a fitness for duty evaluation.  (Def. Ex. 16, 1/24/05 Memo;

---

[1] Directive 10 provides that:

> All personnel (uniformed and non-uniformed) shall keep their hair
> properly trimmed and combed.  The hair shall be worn in a manner
> that does not interfere with the proper wearing of the uniform hat . .
> . . Exception: . . . [h]air may be worn in contemporary styles but shall
> be tapered so as not to extend below the uniform hat.

(Def. Mot. Ex. 5, Directive 10.)

Directive 11 provides that:

> All personnel shall keep their hair properly trimmed and combed,
> avoiding extremes in style and color. The bulk of the hair may not
> present a ragged, unkempt or extreme appearance whether or not the
> officer is wearing the hat.  It shall conform to the contour of the head
> and be tapered to the natural termination point at the base of the neck.
> Braids and cornrows must lie snugly on the head. Hair shall not
> extend below the uniform hat. The hair shall be worn in a manner that
> does not interfere with the proper wearing of the uniform hat, except
> when required by assignment.

(Def. Mot. Ex. 6, Directive 11.)

3

Def. Ex. 7, Evans Dep. 21, 36, 67.)  Officer Dodd was suspended with pay for three days pending the results of the psychological evaluation.  He ultimately was reinstated to his original position. (1/24/05 Memo; Evans Dep. 20, 39; Def. Ex. 17, Psychological Evaluation Report.)

On February 8, 2005, Captain Rowell purportedly observed Officer Dodd with his hair in a prohibited ponytail style, which Officer Dodd denies.  (Def. Mot. Ex. 21, 2/9/05 Pre-disciplinary Interview Memo; Dodd Dep. 175-177, 181.)  As a result, on February 16, 2005, following a pre-disciplinary interview on February 9, 2005, Captain Rowell issued Officer Dodd a five-day suspension without pay and final warning for violating Procedural Directive 10.  (Id.; (Def. Mot. Ex. 22, 2/16/05 Disciplinary Action Memo.)  Captain Rowell also ordered Officer Dodd to cut his hair.  (2/16/05 Memo.)  An arbitrator later found just cause for the violation, but reduced the penalty to a one-day suspension and withdrew the final warning.  (Def. Mot. Ex. 24, 4/7/05 Decision.)

Lieutenant John Arnold, an officer in the SEPTA Police Department Internal Affairs Unit, subsequently conducted an investigation into the allegations in Officer Dodd's January 2005 memorandum.  (Def. Mot. Ex. 18, Arnold Dep. 15.)  As part of that investigation, on February 8, 2005, Lieutenant Arnold interviewed Officer Dodd regarding his allegations of misconduct within the Department.  (Def. Mot. Ex. 19, Memo of Internal Affairs Interview.)  After reviewing the results of Lieutenant Arnold's investigation, Deputy Chief Scott concluded that Officer Dodd "may have violated SEPTA's policies and procedures," and assigned Lieutenant Michael Gritsko to determine whether there had been a violation and, if so, to issue appropriate discipline.  (Def. Mot. Ex. 20, 3/4/05 Memo.)

On March 8, 2005, Lieutenant Gritsko ordered Officer Dodd to attend a pre-disciplinary

4

interview for alleged violations of SEPTA Police Department directives regarding the allegations and opinions expressed in Officer Dodd's January 2005 memorandum.  (Def. Mot. Ex. 26, 3/8/05 Memo.)  After reviewing Lieutenant Arnold's investigation and considering Officer Dodd's pre-disciplinary interview, on March 17, 2005, Lieutenant Gritsko terminated Officer Dodd's employment with SEPTA.  (Def. Mot. Ex. 28, 3/17/05 Memo.)

Specifically, Lieutenant Gritsko determined that Officer Dodd had violated Procedural Directive 19, "Right, Duty, and Opportunity to Present Complaints or Information," because he made unsubstantiated and unsupported allegations of misconduct and criminal activity against his fellow police officers, supervisors and the administration.  (Id.; Def. Mot. Ex. 29, Directive 19.)  Lieutenant Gritsko also concluded that Officer Dodd had violated Procedural Directive 36, "Internal Affairs Investigations," because he provided only "vague" and "evasive" answers during the March 10, 2005 pre-disciplinary interview, and "omitted facts relating to serious allegations of police misconduct."  (Def. Mot. Ex. 28, 3/17/05 Memo; Def. Mot. Ex. 30, Procedural Directive 36.)  Officer Dodd appealed the discipline decision.  SEPTA's Labor Relations Department found just cause for the violation, but reduced the penalty to a time-served disciplinary suspension (74 days without pay).  Officer Dodd returned to work on June 28, 2005. (Def. Mot. Ex. 32, 6/8/05 Letter from Sue Sanderson.)  Prior to returning to work, on June 10, 2005, Officer Dodd filed a complaint with the EEOC.  (Def. Mot. Ex. 35.)

On December 20, 2005, Captain Rowell again purportedly observed Officer Dodd wearing his hair in a ponytail.  Following a pre-disciplinary interview, on January 10, 2006, Captain Rowell terminated Officer Dodd's employment.  (Def. Mot. Ex. 37, 1/10/06 Disciplinary Action Memo.)  Officer Dodd disputes that he was wearing his hair in a prohibited style on

December 20, 2005.  (Dodd Dep. 243-245.)

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the Court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case," id. at 325, or by offering affirmative evidence which demonstrates that the plaintiff cannot prove his case, Lawrence v. Nat'l Westminister Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996).  After the moving party has met this initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

The evidence provided by the nonmovant is to be believed, and the Court must draw all reasonable and justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255, and

resolve all "doubts and issues of credibility against the moving party," Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972).  At the summary judgment stage, the Court's function "is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000).

**DISCUSSION**

**I.    Religious Discrimination**

In the Amended Complaint, Officer Dodd asserts religious discrimination claims pursuant to Title VII and the PHRA (Counts I and III).  Under Title VII, it is unlawful for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of . . . religion."  42 U.S.C. § 2000e-2(a)(1) (1982).  There are two possible theories of religious discrimination: disparate treatment and failure to accommodate.  Abramson v. Willaim Patterson College of New Jersey, 260 F.3d 265, 281 (3d Cir. 2001) (citations omitted).  Officer Dodd is pursuing a claim under both theories, as well as a hostile work environment claim.

**A.    Disparate Treatment**

Under a disparate treatment theory of religious discrimination, the evidentiary burdens are the same as those applied in race and gender discrimination cases.  According to the burden-shifting framework set forth in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff must first demonstrate a prima facie case.  Id. at 803-05.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action.  Id.; Goosby v. Johnson & Johnson Med., Inc., 228

F.3d 313, 318-319 (3d Cir. 2000).  Should the employer meet its burden, the burden shifts back

to the plaintiff to demonstrate that the proffered reason was merely a pretext for unlawful

discrimination.  Goosby, 228 F.3d at 319.[2]

### 1.     Prima Facie Case

To establish a prima facie case of discrimination, a plaintiff must show that (1) he is a

member of a protected class, (2) he was qualified for the position he held, (3) he suffered an

adverse employment action, and (4) similarly situated persons outside of his protected class were

treated more favorably, or the circumstances of the adverse employment action give rise to an

inference of discrimination.  See Jones, 198 F.3d at 410-11.  Because an employee's religion will

not always be apparent or documented, in religious discrimination cases, the plaintiff must also

show that the employer knew of his religion.  Geraci v. Moody-Tottrup, Int'l, 82 F.3d 578, 581

(3d Cir. 1996).  The Third Circuit Court of Appeals has opined that "there is a low bar for

establishing a prima facie case of employment discrimination."  Scheidemantle v. Slippery Rock

Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir 2006) (citations omitted).

Here, Officer Dodd has succeeded in making out a prima facie case.  He is Rastafarian

and, as a result, a member of a protected religious class.  Officer Dodd also appears to be

qualified for the position of SEPTA police officer, having been hired in 1999 and successfully

completing SEPTA police training leading to being commissioned as a police officer.  It is

undisputed that Officer Dodd was subject to several adverse employment actions, included

suspension and termination.  Lastly, as discussed in depth below as to "Pretext," there is

---

[2] The McDonnel Douglas framework applies equally to Title VII and PHRA claims.
Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

evidence in the record that raises an inference of discrimination, as well as evidence that similarly situated persons who are not Rastafarian were treated more favorably.  In sum, the evidence in the record at least suffices to make out a prima facie case.

Officer Dodd also has presented sufficient evidence that the Defendants were aware of his religion prior to the adverse employment actions at issue.  Prior to receiving Chief Evans's December 9, 2004 Memorandum, Officer Dodd had not discussed his religion with his supervisors.  (Dodd Dep. 58.)  However, he disclosed his religion to Captain Rowell and Chief Evans during the December 15, 2004 meeting.  (Id. at 56, 101-02.)  Another SEPTA police officer, Ronald Davis, who was present at the December 15, 2004 meeting as Officer Dodd's union representative, also testified that Officer Dodd stated at that meeting that he was Rastafarian.  (Davis Dep. 27-28, 31.)  Thus, at least from that point in time, the Defendants were aware of Officer Dodd's religious affiliation.

### 2.    Legitimate, Non-Discriminatory Reason

If Officer Dodd establishes a prima facie case, the burden shifts to SEPTA to proffer a legitimate, non-discriminatory reason for taking disciplinary action against, and ultimately discharging, Officer Dodd.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  Here, SEPTA has satisfied its burden.

SEPTA's burden to rebut the presumption of discrimination is "one of production, not persuasion; it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  Thus, SEPTA can satisfy its burden by presenting evidence sufficient to conclude that there was a nondiscriminatory reason for the plaintiff's discharge.  Fuentes, 32 F.3d at 763 (citing

9

Hicks, 509 U.S. at 508).  Our Court of Appeals has described this burden as "relatively light," as the defendant need not prove that its tendered reason actually motivated its decision.  Fuentes, 32 F.3d at 763 (citing Burdine, 450 U.S. at 253).

SEPTA has set forth two facially legitimate, non-discriminatory reasons for Officer Dodd's termination.

First, despite receiving several warnings, Officer Dodd – at least in the view of the Defendants – continued to violate Procedural Directive 10 ("Appearance of Police Personnel"), ultimately leading to a five-day suspension and "final warning" from Captain Rowell on February 16, 2005.  (See Dodd Dep. at 175-176; 2/9/05 Pre-Disciplinary Interview Memo; 2/16/05 Disciplinary Action Memo.)  Captain Rowell also ordered Officer Dodd to cut his hair to a length that conformed to the shape of his head, and warned Officer Dodd that failure to adhere to this direct order would subject him SEPTA's disciplinary code.  (Def. Mot. Ex. 23, 2/16/05 Grooming Standards Memo.)  Captain Rowell maintains that on December 20, 2005, he again observed Officer Dodd wearing his hair in a prohibited style.  (See Def. Mot. Ex. 36, 12/29/05 Pre-Disciplinary Interview Memo; Def. Mot. Ex. 4, "Investigation into Officer Dodd's Appearance"; Simmons Dep. at 42.)  Following an investigation into Officer Dodd's December 20, 2005 appearance, Captain Rowell terminated Officer Dodd's employment for neglect of duty, conduct unbecoming an officer and failure to obey a direct order.  (Def. Mot. Ex. 37,1/10/06 Disciplinary Action Memo.)

Second, Lieutenant Gritsko terminated Officer Dodd on March 17, 2005 for violating Directives 19 and 36 in connection with Officer Dodd's January 21, 2005 memorandum.  The Defendants maintain that Officer Dodd was disciplined for distributing the memorandum

because it contained unsubstantiated allegations in violation of Directive 19, and because Officer

Dodd provided "vague" and "evasive" answers during the March 10, 2005 pre-disciplinary

interview in violation of Directive 36.  (3/17/08 Memo; Gritsko Dep. 37, 82; Directive 19;

Directive 36.)

     While Officer Dodd disputes the Defendants' proffered reasons, there is sufficient

evidence in the record to at least meet the Defendants' minimal burden of production.

### 3.     Pretext

     If the defendant meets its burden, the plaintiff can defeat summary judgment only by

introducing evidence that would allow a reasonable factfinder to (1) disbelieve the defendant's

proffered reasons, or (2) believe that a discriminatory reason more likely than not was a

motivating or determinative cause of the defendant's action.  <u>Fuentes</u>, 32 F.3d at 764 (citations

omitted).  The plaintiff cannot discredit the defendant's reason simply by showing that it was

wrong or mistaken because the pertinent factual dispute is whether "discriminatory animus

motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  <u>Id.</u>

at 765.  Instead, the plaintiff "must demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in the defendant's reason that a reasonable

factfinder rationally could find them unworthy of credence and thereby indicative of

discrimination.  <u>Id.</u> (citations omitted).

     Here, Officer Dodd points to the absence of evidence of disciplinary action against any

other officer whose hair was not strictly in compliance with the grooming code, and to the

Defendants' alleged derogatory and negative comments about the Rastafarian religion.

     The evidence in the record indicates that at least two male officers wore their hair such

that it was visible below the uniform hat, but were not disciplined.  See Davis Dep. 39, 48, 80-81, 83 (Officer Davis wore "braids" and was never disciplined); Gritsko Dep. 12-15 (Lieutenant Gritsko wore his hair such that it protruded below his uniform hat technically in violation of the grooming code, but was never disciplined).[3]  Indeed, as a general matter, the Defendants concede that Officer Dodd is the *only* SEPTA police officer ever to be disciplined for a violation of the SEPTA Police Department's appearance standards.  (7/8/08 Tr. at 8.)

There is also ample evidence in the record of religious animus.  For example, during the meeting on December 15, 2004, Chief Evans allegedly

> start[ed] talking about police officers in New York City who are Rastafarians, and the fact that New York City allows Rastafarians in their police department – and starts talking about those people.  "I don't know how they even got the job.  I wouldn't trust them to help me if I had a problem," constantly using terms like "they" and "them" and "those people" and just a very demeaning and derogatory retort to [an apology.] . . . . [H]e went into that whole rant or whatever it was where he's insulting Rastafarians, telling me how in his opinion they are inappropriate simply because they are Rastafarians, and this – because of his statement that he wouldn't trust them to help him if he had a problem and, you know, just very completely out of line.

(Dodd Dep. 97-98.)  Chief Evans also purportedly compared Officer Dodd to "a sick dog."  (Id.

---

[3] Officer Dodd also points to the fact that at least five female officers wore their hair in a ponytail, but the appearance standards applied to female police officers are irrelevant here. Female officers are not valid comparators because they lawfully may be subject to different grooming standards than men.  See Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 181 (3d Cir. 1985), overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Thus, Officer Dodd cannot use evidence of the hairstyles of female police officers as evidence that similarly situated non-Rastafarian individuals were treated differently.  With respect to grooming standards, men and women are not similarly situated.  However, evidence of female officers' hairstyles nonetheless may be relevant in connection with Officer Dodd's failure-to-accommodate claim because such evidence shows that ponytails or buns did not interfere with officers' duties or the uniformity of the SEPTA police force, and thus could be considered as a reasonable accommodation for Officer Dodd.

at 160, 162, 224.)  This is corroborated by Officer Davis.  (Davis Dep. 40, 67, 78.)  In addition, Deputy Chief Scott testified that he believes that the Rastafarian religion consists of "people smok[ing] marijuana" and wearing dreadlocks.  (Pl. Ex. A, Scott Dep. 16-17.)

The testimony of other SEPTA supervisors also lend credence to Officer Dodd's pretext argument.  Sergeant Kevin Mahoney, who was Officer Dodd's direct supervisor, testified that he never had any reason to discipline Officer Dodd and that, despite being Officer Dodd's direct supervisor, Sergeant Mahoney was never interviewed by anyone regarding Officer Dodd's appearance or hairstyle.  (Pl. Ex. B, Mahoney Dep. 20-21.)  This testimony is uncontested.  (Def. Response to Counter Statement of Facts ¶ 187.)  And according to Officer Davis, "it just seemed as though there were several different policies and memos that came out that were directed at Officer Dodd."  (Id. at 47-48.)

Finally, there is evidence that the disciplinary sanctions for the February 8, 2005 and the December 20, 2005 hairstyle incidents contravened SEPTA's discipline code.  (See Pl. Ex. 4.)  Under SETPA's code, the disciplinary action for the first infraction is a written reprimand.  (Id.)  The disciplinary action for a second offense is a one-day suspension.  (Id.)  Here, however, Officer Dodd received a five-day unpaid suspension for the first offense and was terminated for the second offense.  (2/16/05 Disciplinary Action Memo; 1/10/08 Disciplinary Action Memo.)  Both of these sanctions appear possibly disproportionate to the standard disciplinary actions outlined in SEPTA's code.  Viewed in favor of Officer Dodd, this evidence raises an inference of

13

discriminatory (and/or retaliatory) animus.[4]

In sum, the evidence in the record here is sufficient to call into question the true

motivations for disciplining and ultimately terminating Officer Dodd, making summary judgment

inappropriate.  See Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989) ("When the

defendant's intent has been called into question, the matter is within the sole province of the fact

finder.").

**B.      Failure to Accommodate**

Title VII requires employers to make reasonable accommodations for their employees'

religious beliefs and practices, unless doing so would result in "undue hardship" to the employer.

42 U.S.C.§§ 2000e2(a)(1),[5]2000e(j) ; Shelton v. University of Medicine & Dentistry of New

Jersey, 223 F.3d 220, 224 (3d Cir. 2000).  To establish a prima facie case, the employee must

show (1) he holds a sincere religious belief that conflicts with a job requirement; (2) he informed

his employer of the conflict; and (3) he was disciplined for failing to comply with the conflicting

---

[4] Officer Dodd presents evidence that other SEPTA police officers were not disciplined
for their misconduct.  (Pl. Counter Statement of Facts ¶¶ 123-146; Pl. Response Exs. I, J, M, N.)
It appears that Officer Dodd is offering this evidence to support his showing of pretext, as well as
to substantiate the allegations in his January 21, 2005 memorandum.  With respect to
demonstrating pretext, Officer Dodd has not shown that the officers in question are valid
comparators.  With respect to the memorandum, the factual bases for Officer Dodd's allegations
are moot at this point because Officer Dodd has admitted that he did not personally witness any
of the alleged misconduct about which he wrote in the memorandum, and did not investigate the
rumors he had heard prior to writing the memorandum.  These concessions are sufficient to
satisfy the Defendants' burden of demonstrating a legitimate, non-discriminatory reason for the
adverse employment actions that followed.

[5] "The term 'religion' includes all aspects of religious observance and practice, as well as
belief, unless an employer demonstrates that he is unable to reasonably accommodate an
employee's . . . religious observance or practice without undue hardship on the conduct of the
employer's business."  42 U.S.C. § 2000e(j) (1982).

requirement.  <u>Shelton</u>, 223 F.3d at 224 (<u>citing</u> <u>Protos v. Volkswagen of Am., Inc.</u>, 797 F.2d 129, 133-34 (3d Cir. 1986)).

If the employee establishes a prima facie case, the burden shifts to the employer to show that it made good faith efforts to accommodate the employee's religious beliefs, or that the requested accommodation would create an undue hardship.  <u>Id.</u>

## 1. Prima Facie Case

Officer Dodd has succeeded in making out a prima facie case.

First, the evidence is sufficient to establish that Officer Dodd's bona fide religious beliefs required him to have long hair (Dodd Dep. 192), which conflicted with SEPTA's grooming standards.  The Defendants contend that Officer Dodd's claim fails because he never identified wearing his hair in a ponytail as a matter of religious belief.  While this is an accurate statement, it does not fairly characterize the issue in this case.

Officer Dodd wears his hair in dreadlocks to express his religious faith – that is, because he is Rastafarian and "Rastafarians wear their hair in that manner."  (Dodd Dep. 23.)  While Officer Dodd concedes that his religious beliefs do not require him to wear his hair in a ponytail or bun (<u>id.</u> at 106), his religious beliefs do prohibit him from cutting his hair (<u>id.</u> at 192). Technically, Directives 10 and 11 do not prohibit Officer Dodd from having long hair so long as his hair does not show below his uniform hat.  (<u>See</u> Def. Mot. Exs. 5 and 6.)  Thus, the ponytail prohibition did not directly interfere with Officer Dodd's religious beliefs.  However, Officer Dodd was unable to find an acceptable hairstyle that complied with SEPTA's grooming requirements and satisfied his supervisors, but also did not require him to cut his hair.

Despite various attempts to comply with the grooming standards, Officer Dodd was

repeatedly rebuked or disciplined because his hair protruded from under his uniform hat.  In addition to the ponytail and bun hairstyles, which Officer Dodd characterizes as "attempts at compliance to departmental directives" (Dodd Dep. 106), Officer Dodd also tried various other approaches, but each time "something else came out that he couldn't wear it this way."  (Davis Dep. 47-48; see also Dodd Dep. 258-266.)  After Captain Rowell ordered Officer Dodd to cut his hair to a length that conformed to the shape of his head (2/16/05 Memo), Officer Dodd consulted his supervisors, Sergeant Simmons and Lieutenant Gritsko, to determine how he could wear his hair without violating the Directives.  (Dodd Dep. 192, 194.)  Sergeant Simmons and Lieutenant Gritsko permitted Officer Dodd to "corn row" his hair (without cutting it) into a style that complied with Directive 10, so long as all the hair was under his hat.  (Id. at 258; Simmons Dep. 94-95.)  However, even the cornrow style ultimately did not comply with the grooming policy because the ends of the cornrows protruded from under the uniform hat.  (Dodd Dep. 258-259.)  Ultimately, Officer Dodd elected to cut his hair in order to comply with the grooming code.  (Id. at 266.)

Because Officer Dodd was unable to maintain his long hair and still successfully and consistently comply with SEPTA's grooming standards, there is evidence that the grooming policy interfered with his religious practice.

The Defendants contend that Officer Dodd could have worn his hair in a "loose" style or a "corn row" style, and still comply with the directives.  If true, this would eliminate any conflict between Officer Dodd's religious beliefs and the grooming standards.  Officer Dodd, however, disputes that he was able to successfully comply with the grooming standards with *any* hairstyle – short of cutting his hair.  For example, on February 8, 2005, Officer Dodd was wearing his hair

in the "loose" style and all the hair was contained in his hat.  (Dodd Dep. 175-180.)  After

ordering Office Dodd to remove his hat, at which point all of his hair was displaced, Captain

Rowell berated Officer Dodd for wearing his hair "like that."  Id.  When Officer Dodd protested

that his hair was not in a ponytail, Captain Rowell purportedly responded, "Well, it's too long."

Id.

      The cases cited by the Defendants on this issue are inapposite.  These cases involve

employment rules that did not affect any religious belief held by the plaintiff.  See Storey v.

Burns Int'l Sec. Servs., 390 F.3d 760 (3d Cir. 2004) (affirming dismissal of claims where

plaintiff was disciplined for displaying confederate symbols, but plaintiff did not claim that

displaying confederate symbols was a fundamental religious belief); Mullen v. Topper's Salon &

Health Spa, Inc., 99 F. Supp. 2d 553, 555 (E.D. Pa. 2000) (dismissing religious discrimination

claim where plaintiff did not advise employer of the religious nature of the alleged

discrimination); Eatman v. United Parcel Service, 194 F. Supp. 2d 256, 268-69 (S.D.N.Y. 2002)

(granting employer's motion for summary judgment in part because the plaintiff, a Rastafarian,

wore his hair in dreadlocks as matter of personal choice and not as a matter of religious

devotion).  Here, the evidence indicates that Officer Dodd had long hair as a matter of his

religious belief, but was unable to satisfactorily comply with Directives 10 and 11 without

cutting his hair.

      With respect to the second element of the prima facie case, there is sufficient evidence

that Officer Dodd disclosed his religion to Captain Rowell and Chief Evans during the December

15, 2004 meeting.  (Dodd Dep. 56, 101-02; Davis Dep. 27-28, 31.).  As the purpose of the

meeting was to discuss Officer Dodd's noncompliance with the grooming code due to his long

17

hair, the Defendants were keenly aware of the conflict between Officer Dodd's hairstyle and the appearance standards.  Id.  The lengthy discussion about Rastafarians and hairstyles at the meeting demonstrates that the Defendants also were aware of the link between Officer Dodd's hairstyle and his religion.  (Id.)  In addition, after receiving Captain Rowell's memorandum ordering him to cut his hair, Officer Dodd explicitly informed his supervisors, Sergeants Simmons and Gritsko, that it was "against [his] belief to cut [his] hair."  (Dodd Dep. 192.)

Lastly, it is undisputed for purposes of this Motion that Officer Dodd was disciplined and ultimately terminated for failing to comply with the grooming standards.  (Def. Statement of Facts ¶¶ 59, 88; Def. Mem. 22 n.13.)

### 2.        Good Faith Efforts or Hardship

If Officer Dodd succeeds in establishing a prima facie case, the burden shifts to SEPTA to demonstrate that it made a good faith effort to accommodate Officer Dodd's religious beliefs, or that any such accommodation would constitute an undue hardship.  Shelton, 223 F.3d at 224. A sufficient accommodation need not be the most reasonable one (in the employee's view), or the one the employee suggests, or one that is least burdensome to the employee.  Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 67-69 (1986).  An employer satisfies its religious accommodation obligation when it offers any reasonable accommodation.  Id.

Here, the evidence in the record is sufficient to allow a conclusion that the Defendants failed to make good faith efforts to accommodate Officer Dodd's religious beliefs, and there is no evidence that any plausible accommodation, such as wearing a ponytail, would have caused

an undue hardship.[6]  In particular, there is evidence that numerous female employees wore their

hair in ponytails without any causing SEPTA any hardship.  The evidence of female officers'

hairstyles is relevant because it shows that ponytails or buns did not interfere with the officers'

duties or the uniformity of the SEPTA police force, and thus could be adopted as a reasonable

accommodation.

The Defendants point to the fact that Sergeants Simmons and Gritsko permitted Officer

Dodd to wear his hair in "corn rows" in lieu of cutting it.  (Dodd Dep. 194.)  This effort,

however, failed to solve the problem because even with "corn rows," Officer Dodd's hair

impermissibly extended below his hat.  (Dodd Dep. 258-259.)  Consequently, Anton v. The

Wackenhut Corp., 2002 WL 32502095 (D. Md. Jul. 9, 2002), in which the court granted

summary judgment because the employer accommodated the plaintiff by permitting him to tuck

his dreadlocks up under a hat, is not persuasive here.

The other cases cited by the Defendants are also inapposite because the plaintiffs in those

cases requested *complete* exemptions from the personal grooming codes at issue.  See Webb v.

City of Phila., 2007 WL 1866763, at *4 (E.D. Pa. Jun. 27, 2007) (holding that allowing plaintiff,

a Muslim female, to wear a khimar – a cloth used to cover the head – would be an undue

hardship); Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 136 (1st Cir. 2004) (holding that

an outright exemption from a neutral dress code "would be an undue hardship because it would

---

[6] Analogizing to the rule governing ADA failure to accommodate claims, Officer Dodd emphasizes SEPTA's failure to engage in a "good faith interactive process."  (See Pl. Mem. 22-28.)  Officer Dodd does not offer any legal authority for the proposition that the ADA requirement or analysis applies with equal force to Title VII claims.  However, the Court need not reach this question here because even leaving aside any "interactive process" requirement, the Court must deny summary judgment for the reasons discussed here.

adversely affect the employer's public image"); <u>Brown v. F.L. Roberts & Co., Inc.</u>, 419 F. Supp. 2d 7, 12 (D. Mass. 2006) (holding that an outright exemption for plaintiff, a Rastafarian who does not shave or cut his hair, from employer's dress code would be an undue burden). Here, Officer Dodd merely requested to wear his hair in any style that would allow him to keep it long, a minor deviation from the grooming policy that apparently was already practiced by several other officers.

In sum, there is sufficient evidence in the record to permit a conclusion that Officer Dodd was unable to comply with the grooming directives despite experiments with various different hairstyles, and that the Defendants failed to offer him an accommodation that did not require Officer Dodd to cut his hair. The Court will deny summary judgment on Officer Dodd's failure to accommodate claim.

### C. Hostile Work Environment

Under Title VII and the PHRA, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1).

In order to establish a hostile work environment claim under Title VII and the PHRA, a plaintiff must show that "(1) he suffered intentional discrimination because of his [religion]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." <u>Cardenas v. Massey</u>, 269 F.3d 251, 260 (3d Cir. 2001) (<u>citing</u> <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1081 (3d Cir. 1996)). The harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's]

employment and create an abusive working environment." <u>West v. Philadelphia Elec. Co.</u>, 45

F.3d 744, 753 (3d Cir. 1995) (<u>citing</u> <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986))

(internal quotations omitted); <u>see also</u> <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1482 (3d Cir.

1990) (characterizing the second prong of the test as whether the harassment was "pervasive or

severe"). The Court must consider the "totality of the circumstances" to determine whether the

alleged conduct constitutes a hostile work environment. <u>Cardenas</u>, 269 F.3d at 260-61; <u>West</u>, 45

F.3d at 753.

 Our Court of Appeals has cautioned that in considering whether a plaintiff has established

the elements of a hostile work environment, "the record must be evaluated as a whole to decide

whether the plaintiff has proved his or her case, because '[p]articularly in the discrimination area,

it is often difficult to determine the motivations of an action and any analysis is filled with

pitfalls and ambiguities . . . . [A] discrimination analysis must concentrate not on individual

incidents, but on the overall scenario.'" <u>Cardenas</u>, 269 F.3d at 260-61. Moreover, Title VII

applies to both facially neutral mistreatment and overt discrimination, which in sum constitute

the hostile work environment. <u>Id.</u> at 261 (<u>citing</u> <u>Aman</u>, 85 F.3d at 1081-84) (discussing the

obligation of the courts to be "increasingly vigilant" against subtle forms of discrimination, and

the importance of allowing plaintiffs to prove discrimination indirectly)). As the Court of

Appeals has emphasized, "the advent of more sophisticated and subtle forms of discrimination

requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom,

including those concerning incidents of facially neutral mistreatment, in evaluating a hostile

work environment claim." <u>Id.</u> at 261-62.

 Here, the evidence in the record, viewed in favor of Officer Dodd, suffices to demonstrate

a hostile work environment claim.  Because the fifth element – the basis for vicarious liability – is uncontested, the Court will focus on the other four elements.

### 1.      Unlawful Basis for the Alleged Discrimination and/or Harassment

Here, the alleged harassment and discrimination concerned Officer Dodd's hair and, by extension, his religion.  As previously discussed, there is evidence that the Defendants were aware of Officer Dodd's religion at least by December 15, 2004.  There is no evidence that the Defendants were aware of Officer Dodd's religion prior to December 15, 2004, even though Officer Dodd contends that the alleged harassment began in May 2003.  Consequently, Officer Dodd's hostile work environment claim will be limited to the time period from December 15, 2004 to January 10, 2006, when he was terminated.  With respect to this time period, the reported comments of Chief Evans and Deputy Chief Scott are sufficient to link the discrimination to Officer Dodd's religion.  (See Dodd Dep. 97-98, 160, 162, 224; Davis Dep. 40, 67, 78; Scott Dep. 16-17.)

### 2.      Nature and Frequency of the Alleged Discrimination

Officer Dodd had frequent encounters with his supervisors concerning his hair and his religion, beginning with the December 15, 2004 meeting and ending with the December 20, 2005 encounter with Captain Rowell.  As previously discussed, there is evidence that Chief Evans and Deputy Chief Scott made derogatory comments about Rastafarians and the Rastafarian religion, and that enforcement of the grooming standards was directed exclusively at Officer Dodd.  Moreover, there is evidence that despite Officer Dodd's best efforts, he was unable to comply with the grooming standards without violating his religious beliefs, and was repeatedly and severely disciplined for his failure to do so.  Notwithstanding a period of apparent calm from

22

June 28, 2005 until December, 19, 2005, this series of events is sufficiently pervasive, regular and severe to constitute a hostile work environment.

### 3&4.   Effect on Officer Dodd and Effect on a Reasonable Person

The evidence in the record is sufficient to consider that the alleged harassment had a detrimental effect on Officer Dodd.  For example, Officer Dodd has testified that the alleged harassment caused difficulties in his marriage, requiring him to see a marriage counselor.  (Dodd Dep. 300.)  Specifically, "the stress that [Officer Dodd] was going through on the job . . . caused [him] to put undue pressure on [his] wife."  (Id. at 300-01.)  In addition, following Officer Dodd's termination, there is evidence that he "lost a lot of weight" and was "somewhat isolated for a brief period" before he "got up and got out there and got busy."  (Id. 298-99.)  Finally, there is evidence that, contrary to his religious beliefs, Officer Dodd ultimately resorted to cutting his hair in apparent frustration following approximately 12 months of alleged harassment.  (Id. at 266.)  Considered together, this evidence is at least minimally sufficient to permit Officer Dodd to proceed with his claim that the alleged harassment had a "detrimental" affect on him.  There likewise is sufficient evidence to see that a reasonable person of Officer Dodd's religion would have been detrimentally affected by the series of events and interactions that culminated in Officer Dodd's termination.

## II.   Retaliation

### A.   Title VII and the PHRA

In the Amended Complaint, Officer Dodd also asserts retaliation claims under Title VII, the PHRA and the First Amendment (Counts II, IV and V).  Because retaliation claims under Title VII and the PHRA have the same elements and are analyzed in the same way, the Court will

discuss them simultaneously.  See Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)

### 1.    Prima Facie Case

To establish a prima facie case of retaliation under Title VII or the PHRA, a plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action[7] contemporaneous with or subsequent to his participation in the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action. Weston v. Commonwealth of Pa., 251 F.3d 420, 430 (3d Cir. 2001).  Protected activity includes "formal charges of discrimination as well as informal protests of discriminatory employment practices, including making complaints to management."  Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence that it imposed the adverse employment action for legitimate reasons.  Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006).  As in the discrimination context, the plaintiff must then provide evidence that casts substantial doubt on the employer's reasons that would support a jury finding that the reasons are merely pretext for retaliation.  Id.  To obtain summary judgment on a retaliation claim, the employer must show that the trier of fact could not conclude, as a matter of law, (1) retaliatory animus played a role in the employer's decision making

---

[7] Officer Dodd notes that the Second Circuit Court of Appeals has held that "[r]etaliatory harassment, rather than an adverse employment decision, may form the basis for a retaliation claim."  Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).  While some district courts in the Third Circuit have accepted this theory, the Court need not decide whether to apply it here because Officer Dodd has alleged traditional adverse employment actions, i.e., suspension and termination.

process, and (2) that it had a determinative effect on the outcome of that process.  <u>Krouse v. Am.</u>

<u>Sterilizer Co.</u>, 126 F.3d 494, 500-01 (3d Cir. 1997).

a.      <b>Protected Activity</b>

The Defendants concede that Officer Dodd's December 2, 2004 "Issues of Concern"

Memorandum (Def. Mot. Ex. 8) and his June 10, 2005 EEOC Complaint (Def. Mot. Ex. 33)

arguably constitute protected activity.  (Def. Mem. 26 n.17.)  <u>See also</u> <u>Curay-Cramer v. Ursuline</u>

<u>Acad. of Wilmington, Del., Inc.</u>, 450 F.3d 130, 135-36 (3d Cir. 2006) (protected speech can take

the form of informal protests of discriminatory employment practices, including making

complaints to management).  Officer Dodd's January 21, 2005 "Enema" Memorandum (Def.

Mot. Ex. 15), in which he criticizes perceived discriminatory practices within the SEPTA Police

Department, likewise constitutes protected activity.

In addition, Officer Dodd contends that the complaints he voiced during the meetings

with his supervisors on December 15, 2004 and February 9, 2005 constitute protected activity.  In

the Third Circuit, however, general complaints of unfair treatment do not constitute "protected

activity."  <u>Slagle</u>, 435 F.3d at 267-68.  In other words, to decide whether a plaintiff has engaged

in opposition conduct, the Court must "look to the message being conveyed rather than the

means of conveyance."  <u>Curay-Cramer</u>, 450 F.3d at 135.

In <u>Slagle</u>, the plaintiff filed a complaint with the EEOC alleging that the defendant

"discriminated against me because of whistleblowing, in violation of my Civil Rights, and

invasion of privacy."  435 F.3d at 263.  When the plaintiff was discharged less than four months

later, he brought a retaliation claim under Title VII.  Explaining that the EEOC complaint

presented only "vague allegations of 'civil rights' violations," and did not specifically identify

25

anything made unlawful by Title VII, the Court of Appeals focused upon whether the underlying "whistleblowing" complaints amounted to valid "protected activities" and affirmed the summary judgment dismissal of the retaliation claim for failure to establish the prima facie element of protected activity.  Id. at 267-68.  See also Barber, 68 F.3d at 701-02 (letter to an employer's human resources department was not protected activity because it did not specifically complain about age discrimination and it neither "explicitly or implicitly" alleged that a protected characteristic was the basis for the adverse employment action).

Here, Officer Dodd's statements at the December 15, 2004 meeting constitute protected activity.  SEPTA's memorandum documenting that meeting, which was signed by both Officer Dodd and Officer Davis, indicates that Officer Dodd stated that he suffered "harassment . . . on the issue of [his] hair," and that this harassment implicates SEPTA's non-discrimination policy because "[t]his hair style has been and still is popular with the Afro-American community." (Def. Mot. Ex. 10, 12/15/04 Memo.)  Officer Dodd also stated that he was being "discriminated against about [his] hair," and referred to "harassing and discriminatory behavior of the Deputy Chief."  (Id.)  While Officer Dodd did not explicitly state that he had been discriminated against or harassed on the basis of his religion, race or any other protected trait, he does *implicitly* connect the alleged adverse actions to his race.  Read as a whole, Officer Dodd's statement falls within the sphere of protected activity.

In contrast, nothing in the record indicates that the alleged discrimination and harassment were discussed – or even mentioned – at the February 9, 2005 meeting.  (See Def. Mot. Ex. 21, 2/9/05 Memo.)  Consequently, Officer Dodd's statements at that meeting regarding his hairstyle do not constitute protected activity.

26

**b.      Adverse Employment Action**

The Defendants concede for purposes of summary judgment that Officer Dodd's February 16, 2005 five-day unpaid suspension, March 17, 2005 termination, December 20, 2005 half-day unpaid suspension and January 10, 2006 termination all constitute adverse employment actions. (Def. Mem. 32; Def. Reply 11.)  Officer Dodd, however, asserts that the February 2005 psychological evaluation and Internal Affairs investigation also constitute adverse employment actions, which the Defendants dispute.

An employment action is "materially adverse" when "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 72-73 (2006) (citations and internal quotation marks omitted); Moore, 461 F.3d at 341.  Thus, Officer Dodd may possibly meet his burden by demonstrating that a required psychological evaluation and internal affairs investigation are "likely to deter victims of discrimination from complaining to the EEOC." Burlington, 548 U.S. at 68 (citations and internal quotation marks omitted).  Whether an action is materially adverse will often depend "'on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" Id. at 69 (quoting Oncale, 523 U.S. at 81-82).

Following the December 2004 meetings and the distribution of Officer Dodd's "Enema" memorandum, on January 24, 2005, Chief Evans ordered Officer Dodd to attend a fitness for duty evaluation on the grounds that the "Enema" memorandum caused Chief Evans to question Officer Dodd's ability to function as a police officer.  (1/24/05 Memo; Evans Dep. 21, 36, 67.) Officer Dodd was suspended with pay for three days pending the results of the psychological

evaluation, but ultimately was reinstated to his position without any changes in benefits, rank or responsibility.  (1/24/05 Memo; Def. Mot. Ex. 17, Psychological Evaluation Report.)  The fact that Officer Dodd was the subject of an involuntary psychological evaluation is a permanent record in his personnel file and may be a detriment to obtaining law enforcement positions in the future.  (Pl. Ex. O, Dodd Decl. ¶ 11.)  The involuntary psychological evaluation thus rises to the level of a "materially adverse" action.

In contrast, the internal affairs investigation does not constitute an adverse employment action.  As part of his investigation into the allegations in Officer Dodd's "Enema" memorandum, on February 8, 2005, Lieutenant Arnold interviewed Officer Dodd regarding his allegations of misconduct.  (Internal Affairs Interview Memo; Arnold Dep. 15.)  Although the investigation ultimately resulted in Officer Dodd's termination and a 74-day unpaid suspension prior to his reinstatement, the investigation alone is nothing more than what is to be expected following allegations of institutional misconduct.  Indeed, it arguably would have been reprehensible had SEPTA ignored the allegations of discriminatory and unlawful conduct.

### c.      Causal Connection

To satisfy the causation prong, Officer Dodd must demonstrate that a reasonable jury could link SEPTA's conduct to retaliatory animus.  See Burlington, 548 U.S. at 72-73.  In assessing this, courts generally consider two factors: (1) the "temporal proximity" between the protected activity and the alleged retaliatory response, and (2) "the existence of a pattern of antagonism in the intervening period."  Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006), overruled on other grounds, Burlington, 548 U.S. 53.

Temporal proximity alone may be sufficient to establish the causal connection required

for the prima facie case.  <u>Shellenberger v. Summit Bancorp Inc.</u>, 318 F.3d 183, 189 (3d Cir. 2003).  "[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn."  <u>Fasold v. Justice</u>, 409 F.3d 178, 190 (3d Cir. 2005) (holding that three-month period between protected activity and adverse action raises inference of retaliation).  <u>Cf.</u> <u>Washco v. Federal Express Corp.</u>, 402 F. Supp. 2d 547, 559-60 (E.D. Pa. 2005) (dismissing plaintiff's retaliation claim where five months passed between the protected activity and adverse action); <u>Boykins v. Lucent Techs., Inc.</u>, 78 F. Supp. 2d 402, 415 (E.D. Pa. 2000) (no causation where six months passed between speech and adverse action).

As outlined below, Officer Dodd's protected activities occurred sufficiently close in time to the adverse employment actions to raise an inference of retaliation.

| **Protected Conduct** | **Adverse Action** | **Temporal Proximity** |
|---|---|---|
| 12/2/04 Memorandum | 1/24/05 Psych Evaluation | 53 days (~ 2 months) |
| | 2/16/05 Suspension | 75 days (~ 2.5 months) |
| | 3/17/05 Discharge | 105 days (~ 3.5 months) |
| 12/15/04 Meeting | 1/24/05 Psych Evaluation | 40 days (~ 1.5 months) |
| | 2/16/05 Suspension | 61 days (~ 2 months) |
| | 3/17/05 Discharge | 92 days (~ 3 months) |
| 1/21/05 Memorandum | 1/24/05 Psych Evaluation | 3 days |
| | 2/16/05 Suspension | 26 days |
| | 3/17/05 Discharge | 54 days (~ 2 months) |

| EEOC Complaint – Chief | 12/20/05 Suspension | 28 days (~ 1 month) |
|---|---|---|
| Evans notified 11/22/05[8] | 1/10/06 Discharge | 48 days (~ 1.5 months) |

### 2&3.   Legitimate, Non-retaliatory Reasons and Pretext

The Defendants proffer the same justifications for the adverse employment actions as they do in relation to Officer Dodd's discriminatory treatment claim, namely, Officer Dodd's failure to comply with SEPTA directives concerning appearance standards and internal complaint procedures.  To demonstrate pretext, Officer Dodd likewise points to the same evidence as he does with respect to his discriminatory treatment claim.  As previously discussed, the evidence in the record is sufficient to support a jury finding that SEPTA's proffered reasons are merely pretext for unlawful retaliation and/or discrimination.

In sum, viewed in favor of Officer Dodd, there is sufficient evidence in the record for Officer Dodd to proceed with retaliation claims under Title VII and the PHRA.

### B.      Section 1983 – First Amendment Retaliation Claim

Officer Dodd also asserts that the Defendants' actions following their discovery of his January 21, 2005 memorandum constitute retaliation in violation of the First Amendment of the United States Constitution.

A public employee has a constitutional right to speak on matters of public concern

---

[8] The Defendants contend that Captain Rowell, not Chief Evans, was responsible for Officer Dodd's termination and, therefore, there is no causal link because there is no evidence that Captain Rowell knew of the EEOC Complaint.  See Jones, 198 F.3d at 415 (requiring that party responsible for the adverse conduct be aware of the protected activity before causation can be inferred).  However, Captain Rowell testified that "it's possible" that he was aware of Officer Dodd's EEOC Complaint prior to January 9, 2006.  (Def. Mot. Ex. 12, Rowell Dep. 102-103.)  Moreover, the Defendants concede that Chief Evans "at all relevant times was the highest-ranking officer in Officer Dodd's chain of command."  (Def. Statement of Facts ¶ 2.)

without fear of retaliation.  Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001) (citations omitted); Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir. 1994) ("A state cannot lawfully discharge an employee for reasons that infringe upon that employee's constitutionally protected interest in freedom of speech.").  While "the government's role as employer . . . gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large," government employers nonetheless cannot act with impunity.  Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality opinion); Watters v. City of Phila., 55 F.3d 886, 895-96 (3d Cir. 1995).

A public employee's First Amendment retaliation claim for engaging in protected activity is evaluated under a three-step process.  Baldassare, 250 F.3d at 194 (citations omitted).  First, a plaintiff must establish that the activity in question was protected.  Id. (citations omitted).  For this purpose, the speech must involve a matter of public concern.  Id. (citing Connick v. Myers, 461 U.S. 138, 147 (1983); Watters, 55 F.3d at 892).  Once this threshold is met, the plaintiff must demonstrate that his interest in the speech outweighs the government's countervailing interest as an employer.  Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); Baldassare, 250 F.3d at 195.  These determinations are questions of law for the Court.  Baldassare, 250 F.3d at 195 (citing Waters, 511 U.S. at 668; Green v. Phila. Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997)).

If these initial criteria are established, the plaintiff must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action.  Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Watters, 55 F.3d at 892; Swineford v. Snyder County, 15 F.3d 1258, 1270 (3d Cir.1994)).  Lastly, the government

31

employer can rebut the claim by demonstrating that "it would have reached the same decision . . . even in the absence of the protected conduct."  Id. (quoting Doyle, 429 U.S. at 287).  However, these last two stages of the analysis "present questions for the fact finder," and, therefore, will not be addressed here.  Id.; Zamboni v. Stamler, 847 F.2d 73, 79 n.6, 80 (3d Cir.) (noting whether protected activity acted as substantial or motivating factor in discharge and whether same action would have been taken regardless are questions for jury), cert. denied, 488 U.S. 899 (1988); Johnson v. Lincoln Univ., 776 F.2d 443, 454 (3d Cir. 1985) (holding "second and third questions . . . should be submitted to the jury").  Moreover, the Court need not reach these last two elements because it concludes that under the circumstances presented here, SEPTA's interests as an employer outweigh Officer Dodd's limited interest in the specific speech in question.

### 1.    Protected Speech

For purposes of summary judgment, the Defendants concede that Officer Dodd's January 21, 2005 memorandum addresses a matter of public concern under the first element of the Pickering analysis.  (Def. Mem. 27 n.18.)  See also Baldassare, 250 F.3d at 195-96 (matters of public concern include allegations of corrupt practices by government officials).[9]

### 2.    Balancing Interests

The Defendants contend that the January 2005 "Enema" memorandum nonetheless is not protected speech because SEPTA's interests in avoiding disruption outweigh Officer Dodd's interest in the memorandum.

If an employee's speech is a matter of public concern, the Court must balance the

---

[9] Officer Dodd does not contend that his December 2, 2004 memorandum constitutes protected speech for purposes of the First Amendment.  (7/8/08 Tr. at 62-63.)

employee's interest in the speech against the government's interest, as an employer, in efficiently providing public services.  Rankin v. McPharson, 483 U.S. 378, 384 (1987) (citations omitted). The employee must demonstrate that his interest in the speech outweighs any injury the public employer may suffer as a result of that expression.  Brennan v. Norton, 350 F.3d 399, 413 (3d Cir. 2003) (plaintiff's burden to prove that his interest in the speech outweighs the countervailing interest of the state entity).

On the employee's side of this balance, the public's interest in exposing potential wrongdoing by public employees is particularly strong.  Baldassare, 250 F.3d at 195.  The Third Circuit Court of Appeals has emphasized that "[s]peech involving government impropriety occupies the highest rung of First Amendment protection."  Id.  Moreover, "the public's substantial interest in unearthing governmental improprieties requires courts to foster legitimate whistleblowing."  Id. (citing Swineford, 15 F.3d at 1274); see also Feldman, 43 F.3d at 829 ("The interests of [the auditor], as well as the public, in exposing governmental wrongdoing . . . [are] very strong."); O'Donnell v. Yanchulis, 875 F.2d 1059, 1062 (3d Cir. 1989) ("The public has a significant interest in encouraging legitimate whistleblowing . . . .").

With respect to the interests of the employer, the Court must consider "whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  Baldassare, 250 F.3d at 195 (quoting Rankin, 483 U.S. at 388).  In calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important.  Id.  Specifically, the Court must look to the "[p]roximity within an

organizational hierarchy [a]s a significant factor in the employer's demonstration that a public employee's speech had a detrimental impact on a necessarily close working relationship."  Id. (citations omitted); see also Roseman v. Ind. Univ. of Pa., 520 F.2d 1364, 1368 (3d Cir. 1975) (upholding dismissal of First Amendment claim when speaker's expression "called into question the integrity of the person immediately in charge of running a department"), overruled on other grounds, Givhan v. Western Line Consolidated Sch. Dist., 439 U.S. 410 (1979).

In the January 21, 2005 memorandum, which he submitted to all SEPTA Police Department officers, Officer Dodd criticizes what he viewed as discriminatory and unlawful practices by various unnamed officers.  (Def. Mot. Ex. 15, 1/21/05 Memo; Dodd Dep. 127, 128.) Specifically, Officer Dodd states that he had seen officers "berate the less fortunate and avoid aiding members of the public in casual situations," and officers "hesitate or totally avoid an assignment when called to official duty."  (1/21/05 Memo ¶¶ 4, 5.)  Officer Dodd also states that he had "heard tale" of officers whose "integrity was in question" because "[t]hey lied on official documents, they committed crimes within and without their department, they abused certain members of the public whenever possible, and they maintained a posture and attitude that made them unapproachable for a large segment of the Philadelphia population."  (Id. at ¶ 6.)  In this vein, Officer Dodd also points to an unnamed officer "who had committed felonies while in the employ of the department, then conspired with certain Command Staff in the committing of at least one other," but nevertheless was retained.  (Id. at ¶ 20.)  Officer Dodd also describes departmental "policies and practices whose intent is to bias and discriminate" (id. at ¶ 12), and accuses "certain supervisors" of using "racial slurs repeatedly," being "intoxicated on duty," and "fractur[ing] Directives and Civil Rights," as well as lying and stealing with "impunity from this

current administration" (id. at ¶ 21).

Officer Dodd's interest in the speech expressed in the memorandum is high, as is the public's interest in such alleged wrongdoing by government officials.  However, this interest fails to outweigh SEPTA's competing interest in maintaining discipline, close working relationships and the integrity of those in charge of its Police Department.  Persico v. City of Jersey City, 67 F. App'x 669, 674 (3d Cir. 2003) (holding police department's "substantial interest in maintaining its rules and regulations" outweighed plaintiff's interest in speech about a matter of public concern); Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) (noting the need for "order, loyalty, morale and harmony" in law enforcement agencies) (citations omitted); O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (police force requires a special degree of trust and discipline, which strengthens the government's interest in regulatory speech); Campbell v. Towse, 99 F.3d 820, 829-30 (7th Cir. 1996) (recognizing need for loyalty in police departments and finding that police officer's memorandum critical of a community policing program that caused police chief to doubt officer's loyalty was not protected speech as chief's interest in maintaining control of department and preserving discipline decisively outweighed officer's interest in memorandum); Moore v. City of Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995) (heightened interest in maintaining discipline and harmony in context of law enforcement). Officer Dodd's allegations against fellow officers and his supervisors threatened the Department's chain of command and jeopardized trust between fellow officers.

Moreover, in the Third Circuit, allegations by a public employee that are made recklessly are not matters of public concern.  Swineford, 15 F.3d at 1274 (holding that plaintiff's speech was unprotected because her remarks were made recklessly).  See also Pickering, 391 U.S. at 574

(public employee could lose protection of First Amendment for statements made recklessly, or reckless nature of statements would at least weigh heavily against protection); <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1290 (11th Cir. 2000) (recognizing that a police department has a strong interest in preventing its officers from making unfounded accusations against superior officers because it "could be considered disruptive and potentially undermining to the mutual respect and confidence needed for fellow officers in a police department"); <u>Wulf v. City of Wichita</u>, 883 F.2d 842, 858 (10th Cir. 1989) (reckless statements receive less protection).

It is undisputed that Officer Dodd did not know and could not recall the name of even one police officer whom he claimed committed any of the acts of misconduct in question.  (Dodd Dep. 138.)  It is likewise undisputed that Officer Dodd did not personally witness any of the conduct cited in his memorandum, but rather was merely repeating "stories" and "tales" that he had heard second-hand from others.  (<u>Id.</u>)  And Officer Dodd admits that he did not conduct any investigation to determine the truth or falsity of the rumors of misconduct on which he based the allegations in the memorandum.  (<u>Id.</u> at 138-139.)  Under these circumstances, Officer Dodd's unsubstantiated allegations are entitled to less protection as "speech."[10]  Indeed, the Court concludes these expressions by Officer Dodd are no better than rumor-mongering and not entitled to such First Amendment protection as would trigger a Section 1983 claim.

In addition to suing the Individual Defendants, Officer Dodd also sued SEPTA as a government entity under Section 1983 for violating the First Amendment.  (Amd. Compl. ¶¶ 74-

---

[10] In defense of his First Amendment claim, Officer Dodd insists that the matters he discussed in the January 21, 2005 memorandum were already known to both the public and SEPTA officials.  (7/8/08 Tr. at 64-65.)  This fact, however, if true, hinders rather than helps Officer Dodd's claim.  If such allegations of corruption were already known to the public, Officer Dodd would have less of an interest in "exposing" any such alleged wrongdoing.

76.)  Because the Court has determined that there was no underlying constitutional violation, SEPTA and Officer Dodd's supervisors cannot be liable under any theory of municipal or supervisory liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that the threshold requirement for municipal or supervisory liability is an underlying constitutional violation by an employee).

**CONCLUSION**

For the foregoing reasons, the Court will grant summary judgment in favor of the Defendants on Officer Dodd's First Amendment claim, but deny summary judgment with respect to Officer Dodd's Title VII and PHRA religious discrimination, failure to accommodate, hostile work environment and retaliation claims.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

37

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NILES DODD, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SEPTA, ET AL., | : | |
| Defendants | : | NO. 06-4213 |

<u>ORDER</u>

AND NOW, this 23rd day of July, 2008, upon consideration of the Defendants' Motion for Summary Judgment (Docket Nos. 32 and 33), the Plaintiff's response thereto (Docket Nos. 36 and 37) and the Defendants' reply (Docket Nos. 40 and 41), and following oral argument held on July 8, 2008, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART as follows:

1. The Motion is GRANTED as to Plaintiff's Section 1983 First Amendment claim; and

2. The Motion is DENIED as to Plaintiff's Title VII and PHRA discrimination, hostile work environment, failure to accommodate and retaliation claims as outlined in the accompanying Memorandum.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge